IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVEN M SISTEK,       ) | Civil Action No. 07 - 67 |
|         ) | |
| Petitioner,     ) | Magistrate Judge Lisa Pupo Lenihan |

STEVEN M SISTEK,                                    )

                    Petitioner,                     )

          v.                                        )

RAYMOND M. LAWLER, *Superintendent of*             )
*SCI Huntingdon;*  THE ATTORNEY GENERAL            )
OF THE STATE OF PENNSYLVANIA; THE                  )
DISTRICT ATTORNEY OF THE COUNTY OF                 )
WESTMORELAND                                       )
                                                   )
                    Respondents.                   )

Civil Action No.  07 - 67

Magistrate Judge Lisa Pupo Lenihan

## MEMORANDUM OPINION

Petitioner, Steven Sistek, a state prisoner serving a life sentence, has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the reasons that follow, the Petition will be denied.

### A. Factual History

The record reveals the following.  Lonny Biedrycki was born on June 11, 1994.  His Mother, Stephani Sistek, married Petitioner on November 24, 1997; Lonny was 3 ½ years old at the time. Initially, the Sisteks lived with Petitioner's parents until April of 1998 when they moved to Ligonier, Pennsylvania.  In April of 1998, Stephani began working at the local Giant Eagle store.  When she was working, Petitioner was responsible for the care of his stepson Lonny and his daughter, Braunlyn, who was born on January 28, 1998.  Sometime prior to May 1, 1998, Stephani left the house to go to work and Petitioner was watching Lonny.  When Stephanie returned home, Lonny approached her and told her he fell and asked her if she wanted to see.  When Stephani asked Petitioner about it, he said that Lonny was leaning on the glass table and that he hit him on his behind about five times as hard as he could.  The next morning when she gave him a bath, she

noticed bruising and took some Polaroid photographs of the area. When Petitioner came home from work that day, his cousin Jen and her son Louie were at the house. At that time, Stephanie and Jen confronted him about the bruising and he agreed to go to parent counseling.

On May 1, 1998, Petitioner, Stephani and the children went to Auburn Kentucky to visit Stephani's parents. While there, Stephani's parents observed the bruises and confronted Petitioner who again said he would go to counseling. Before the family left, Stephani's mother asked if she could keep Lonny with them for the summer. Stephani refused this request stating that Lonny was going to be the ring bearer in a family member's wedding and needed to be around for the tuxedo fitting and so forth. On May 3, 1998, the family went back to Ligonier.

On May 28, 1998, Stephani went to work at Giant Eagle at about 6:30 p.m. About an hour and half later, she received a phone call from Steven saying Lonny had fallen in the bathtub and was unconscious. She told him to call 911 and then left to go home. She arrived at home to find Lonny in the ambulance about to be life flighted to the nearest trauma unit.

When the paramedics arrived, they discovered Lonny unconscious on the bed fully clothed with damp hair. When asked what happened, Petitioner responded that Lonny had soiled his pants so he put him in the bathtub. While he was there, the baby cried and Petitioner left Lonny in the tub while he made a bottle for the baby. When he came back, he found Lonny unconscious. Petitioner then proceeded to take Lonny out of the bathtub, drained the tub, dried him off, clothed him, cleaned the water off the bathtub floor and finally called Stephani. About fifty one minutes elapsed between the time of the accident and the time Petitioner called 911.

Lonny was life flighted to the Connemaugh Memorial Medical Center where he was sustained on life support systems. Upon examination, several bruises were noted on his body, which

led hospital officials to contact the Westmoreland County Children's Bureau to report suspected child abuse. On the afternoon of May 29, 1998, a brain scan revealed no brain activity in Lonny; he died shortly thereafter never having regained consciousness. Forensic pathologists confirmed that a severe striking of the head on the tub was consistent with the mechanism of injury that caused death.

On June 8, 1998, Police asked Petitioner to come in for questioning. At some point during the interview, Petitioner admitted that he put Lonny in the shower and smacked him in the behind, which caused him to fall and hit his head on the bathtub whereupon he lost consciousness. Petitioner was arrested shortly thereafter and charged with criminal homicide, aggravated assault and simple assault. Petitioner originally was represented by John Sweeney, Esquire of the Office of the Public Defender for Westmoreland County. After that office withdrew as counsel, the Court appointed William McCabe, Esquire to represent Petitioner until on or about September 3, 1999, when he was granted leave to withdraw. Petitioner then waived his right to counsel and proceeded *pro se*. A trial date of October 12, 1999 was scheduled before the Honorable John E. Blahovek who denied Petitioner's motion to continue the trial date on September 17, 1999. On that same date, Petitioner's Omnibus Pretrial Motion was denied from the bench.

On October 8, 1999, just a few days prior to trial, the Commonwealth received a 21-page handwritten statement by Petitioner which graphically outlined the abuse inflicted upon the victim. The statement had been forwarded to the district attorney's office from Petitioner's cell mate, David Witt. The statement was a hand-written account with cross-references to pictures from the autopsy and diagrams of injuries on the body of the victim and describes Petitioner's beating of the child for several weeks prior to the child's death and includes references to killing and torturing the child.

In response to the statement, the Commonwealth filed a Notice of Aggravating Circumstances pursuant to Pennsylvania Rule of Criminal Procedure 352[1] with an intent to seek the death penalty at sentencing. The aggravating circumstances were that the offense was committed by means of torture and the victim was a child under twelve years of age. As a result, the trial was continued and Bruce Antkowiak, Esquire was appointed to represent Petitioner.

After his appointment, Attorney Antkowiak discovered that Petitioner wrote the 21 page letter at the behest of his cell mate Witt solely in order to get a continuance of trial. Consequently, he filed a Motion to Strike Aggravating Circumstances. In support of this motion, counsel submitted the depositions of eight individuals who testified that David Witt was a notorious jailhouse lawyer who had dominated Petitioner, a young man who had never before been incarcerated. Witt had convinced Petitioner to discharge his prior lawyers and rely on Witt's advice in his own defense. When Petitioner's attempt at representing himself at the pretrial motions hearing on September 17, 1999 failed, Witt convinced Petitioner that he needed a continuance of the October 12, 1999 trial date and, perhaps, to have new counsel appointed. Witt further convinced Petitioner that, given the trial court's resolve to grant no more continuances, the only way for Petitioner to obtain one would

---

1. At the relevant time period, Pennsylvania Rule of Criminal Procedure 352 provided as follows:

> The Commonwealth shall notify the defendant in writing of any aggravating circumstances which the Commonwealth intends to submit at the sentencing hearing. Notice shall be given at or before the time of arraignment, unless the attorney for the Commonwealth becomes aware of the existence of an aggravating circumstance after arraignment or the time for notice is extended by the court for cause shown.

Pa. R. Crim. P. 352.

be if a sensational document came into the possession of the Commonwealth. Accordingly, Witt convinced Petitioner to write a fictionalized confession about the circumstances of his step-son's death, cross-reference the autopsy photographs, and give it to Witt who promised that he would take it o the District Attorney's Office in an ostensible effort to get himself a deal on the multiple, serious charges he was facing. Witt promised Petitioner that as soon as he reached a deal with the District Attorney's Office, he would refuse to testify against Petitioner, who would then run no risk of anyone actually believing that the fictionalized statement was true. Contrary to his promises to Petitioner, Witt took the statement to the District Attorney's Office, claimed that it was a truthful rendering of the facts of the case, and further claimed that he was bringing the statement to the District Attorney's Office on Petitioner's behalf so that he could get Petitioner a plea bargain.

On October 10, 2000, the Trial Court denied the motion to strike aggravating circumstances noting that the court's inquiry was limited to whether the Commonwealth abused its discretion in designating the case as capital. Petitioner filed a Petition for Review in the Superior Court, which was denied on February 2, 2001; however, neither the parties nor the trial court were informed of the ruling until February of 2003. In the meantime, during the spring of 2002, Attorney Antkowiak withdrew his appearance when he accepted a teaching position with Duquesne University School of Law. Subsequently, Brian Aston, Esquire and Michael DeMatt, Esquire were appointed to represent Petitioner.

Just prior to the scheduled trial date of July 7, 2003, the Commonwealth made an offer to Petitioner to enter a general plea to criminal homicide, aggravated assault, and simple assault, and stipulate to the authenticity and truthfulness of the 21-page statement and, in exchange, the Commonwealth would not seek the death penalty. The trial court would then determine the degree

of guilt at a separate non-jury hearing. When he presented the offer to Petitioner, trial counsel made clear that, if the case were to go to trial, he was not going to challenge the veracity of the statement but would argue that it showed an intent to abuse or punish but it did not show a specific intent to kill. Aston spoke to Antkowiak about this offer who agreed that it was a good idea except that Petitioner should not stipulate to the letter's truthfulness. Petitioner ultimately accepted the offer and entered a guilty plea to criminal homicide, aggravated assault and simple assault on July 1, 2003. A degree of guilt hearing was held before the trial court on July 9 and 10, 2003. At the hearing, the 21-page statement was read into the record. Following the hearing, Petitioner was found guilty of first degree murder and immediately sentenced to life imprisonment without the possibility of parole.

On July 17, 2003, Petitioner filed a pro se post-sentence motion seeking to withdraw his guilty plea. New counsel, Edward Rowe, Esquire, was appointed who filed an amended post-sentence motion claiming that Petitioner's plea was unknowing, unintentional and involuntary due to trial counsel's ineffectiveness for employing a trial strategy where he would argue that the 21-page statement was true. He claimed that trial counsel was fully aware that he had never acknowledged the truth of the statement and wanted to attack the veracity of the statement at trial. He further claimed that he was induced into entering the plea because defense counsel erroneously informed him that following discussions, Attorney Antkowiak agreed that entering the plea and stipulating to the truth of the statement were in Petitioner's best interest. In addition, he claimed that trial counsel advised that his refusal to stipulate to the truth of the statement would result in a death

sentence. A hearing on the post-sentence motion was held on August 11, 2003, where Attorney Aston, Attorney Antkowiak and Petitioner all testified. The Superior Court made the following findings of fact with regard to the hearing.

Attorney Aston testified that the 21-page statement contained references to killing the child as well as torture. He indicated that such references would qualify as aggravating circumstances in a death penalty case. Attorney Aston acknowledged that he was aware of David Witt's involvement and that a number of inmates had been deposed about the fabrication of the statement. Attorney Aston advised Appellant that if a jury would hear the 21-page statement, they would "throw up" and vote to execute him. Attorney's Aston's initial strategy was to enter a general plea to the charge of criminal homicide, waive the jury trial and argue at the degree of guilt hearing that the statement showed a course of past abusive conduct but a lack of intent to kill. He planned to argue that this was a classic case of third degree murder and noted that Appellant agreed with this strategy. However, at that time, the strategy did not include stipulating to the truth of the statement. Attorney Aston then described his strategy with respect to how he would address the admission of the statement:

> A. We were basically going to embrace the statement, because, again, it showed a pattern of abusive behavior, constant beatings by Mr. Sistek, and argue that what it showed was a lack of intent to kill. There was an intent to injure, inflict injury upon the child, and to abuse or to punish, as the letter often indicated that it was done as a form of punishment for the child having done something incorrect. But it did not show a specific intent to kill.

Attorney Aston also believed that the statement would not have the shocking effect on the trial court than it would have on a jury.

Attorney Aston recounted the plea negotiations which took place. During these negotiations there were discussions about stipulating that the statement was medically accurate. However, ultimately, the Commonwealth offered that Appellant could enter a general guilty plea to criminal homicide and have a non-jury degree of guilt hearing if he stipulated that the 21-page statement was

factually accurate. Attorney Aston acknowledged that Appellant never admitted the statement was true until the time of the guilty plea colloquy. In fact, Appellant had consistently maintained that the statement was false. Attorney Aston also recounted that two pathologists had been contacted to see if the medical evidence coincided with the statement. The pathologists informed him that he should not call them at trial since the forensic evidence was consistent with a pattern of abusive behavior inflicted upon the child. They noted there were some discrepancies but not enough to be helpful to the defense. They informed Attorney Aston that the injury may be accurate but the mechanism being discussed, *i.e.*, how the injury was inflicted, was not accurate. There were also inconsistencies with the hand-drawn picture of the injuries which were not the same shape as the injuries on the child.

Attorney Aston recalled that he had had discussions with Attorney Antkowiak who advised him never to admit the statement was true. He testified that Attorney Antkowiak did not, however, disagree with a stipulation that the Commonwealth had evidence to present that would indicate the statement was accurate and that the defense would have no testimony to oppose that. However, the Commonwealth would only accept the plea if Appellant agreed to stipulate to the statement as true. Attorney Aston testified that he went through the written plea colloquy with Appellant and explained it to him. He maintained that Appellant did not oppose the stipulation but was still reluctant to indicate the truthfulness of the statement.

Attorney Antkowiak testified that during his representation, Appellant never admitted to him that the statement was true. During his investigation, Attorney Antkowiak learned that David Witt was Appellant's cellmate in the Westmoreland County Prison and had encouraged Appellant to discharge his attorney, William McCabe Esquire, and proceed pro se. When this occurred, however, Appellant was unable to competently represent himself. While proceeding pro se, Appellant had asked for a continuance, which was denied. Attorney Antkowiak testified that Witt had told Appellant that the only way to get a continuance and a new lawyer is if something dramatic would happen in the case. Thus, the statement was written while Appellant had the entire file, including the autopsy reports and photographs in his possession. Witt advised Appellant to write as horrendous a statement as he could and that Witt would turn it over to a get deal for himself.

Attorney Antkowiak also testified that he had a discussion with Attorney Aston prior to the entry of the guilty plea. He learned that the Commonwealth had proposed that Appellant would enter a general plea to homicide, that the death penalty would be taken off the table, and the degree of guilt hearing would be non-jury. At that juncture, Attorney Antkowiak believed that the deal should be considered. However, Attorney Aston then informed him that Appellant would also be required to stipulate that the statement was true. Attorney Antkowiak advised that one could not stipulate to the truth of the statement when throughout the history of the case the truthfulness of the statement had been challenged and Appellant had maintained that it was false. Attorney Antkowiak testified that he never told Attorney Aston that he would support such a stipulation. Attorney Antkowiak also spoke with Appellant after the plea and informed him that he never advised Attorney Aston to stipulate to the underlying truth of the statement.

Moreover, although Attorney Antkowiak acknowledged the statement was horrendous, he testified that if he had represented Appellant at trial and the statement was admitted, his defense would have been that the statement was not true. He noted there were several inconsistencies in the statement. Appellant also testified at the hearing and indicated that when he was represented by Attorney Antkowiak, the strategy was to attack the veracity of the statement. He believed this was still the strategy when Attorney Aston was appointed. However, after the pathologist report came back, the strategy changed and he learned that Attorney Aston wanted to embrace the statement as true and establish that there was no intent for purposes of first degree murder. Appellant testified he informed Attorney Aston that he did not agree with the strategy. Appellant also indicated that he was aware of the plea negotiations and learned of the final offer that in order to enter the plea with the death penalty off the table, he would have to stipulate to the truthfulness of the statement. Appellant testified that he believed that Attorney Aston was going to argue that the statement was true. Appellant testified that Attorney Aston explained that Attorney Antkowiak agreed with this strategy. Although Appellant told Attorney Aston that the statement was not true, he agreed to the terms of the plea believing he had no real choice.

Appellant admitted that he had reviewed the colloquy with Attorney Aston and provided responses to questions regarding his reasons for entering the plea and his satisfaction with counsel. Appellant conceded that he had, after consultation with counsel, admitted to the truth of the statement. He acknowledged that he

never told the trial court that he wanted a jury trial. He also knew that as a result of the bargain, the death penalty was off the table.

When questioned by the trial court, Appellant admitted that he wrote the statement upon the advice of David Witt in order to get a continuance and a new attorney appointed. The trial court then asked Appellant to look through the statement and identify the parts which were true and the parts where someone else told him what to say. Appellant responded that parts of the statement were true "[b]ut through everything written that could be construed as true, there's a lie in it."

Doc. No. 68, pp.4-9 (internal citations omitted).

On September 3, 2003, the trial court entered an order denying the post-sentence motion. Petitioner filed a timely Notice of Appeal and on January 31, 2005, the Superior Court of Pennsylvania affirmed the Trial Court's determination denying Petitioner relief. On December 12, 2006, the Supreme Court of Pennsylvania denied Petitioner's Petition for Allowance of Appeal.

On June 11,2007, Petitioner filed a Post Conviction Relief Act Petition in which he alleged that trial counsel, Brian Aston, failed to disclose his relationship with Mr. Sistek's ex-wife and her husband. Mr. Sistek's ex-wife had testified for the prosecution at Petitioner's degree of guilt hearing. After an evidentiary hearing, the Court of Common Pleas denied the petition on Aug. 27, 2007. Petitioner filed a notice of appeal with the Pennsylvania Superior Court, which affirmed the decision of the Court of Common Pleas on July 9, 2008).

Having completed his collateral attack in the state courts, Petitioner filed with this court a petition for writ of habeas corpus pursuant to 28 U.S.C.§ 2254, and, following appointment of counsel, raised the following claims.

1.    Petitioner's Guilty Plea was Not Knowing, Voluntary, and Intelligent as a Result of Trial Counsel's Ineffective Assistance During the Pretrial and Plea Process.

a.      Petitioner's Guilty Plea was Induced by Counsel's Misrepresentations and Was Not a Voluntary, Knowing, and Intelligent Waiver of His Constitutional Rights to a Jury Trial.

b.      Petitioner's Guilty Plea is Invalid Because Trial Counsel's Failure to Investigate Possible Defenses, Interview Known Witnesses, and Seek Expert Advice Prevented Mr. Sistek From Making a Voluntary, Knowing, and Intelligent Waiver of His Constitutional Right to a Jury Trial.

2.      Trial Counsel Failed to Investigate Potential Defenses to First Degree Murder, Interview Known Witnesses, Seek Expert Advice, and Properly Prepare for Degree of Guilt Hearing.

### B. Principles of Habeas Corpus Review

1.      <u>Exhaustion Requirement</u>

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief. To comply with the exhaustion requirement, a state prisoner first must have fairly presented his constitutional and federal law issues to the state courts through direct appeal, collateral review, state *habeas* proceedings, *mandamus* proceedings, or other available procedures for judicial review. *See, e.g.*, <u>Castille v. Peoples</u>, 489 U.S. 346, 351 (1989); <u>Doctor v. Walters</u>, 96 F.3d 675, 678 (3d Cir. 1996); <u>Burkett v. Love</u>, 89 F.3d 135, 137 (3d Cir. 1996). Moreover, a petitioner must present every claim raised in the federal petition to the state's trial court, intermediate appellate court and highest court before exhaustion will be considered satisfied. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838 (1999). The petitioner has the burden of establishing that exhaustion has been satisfied. <u>Ross v. Petsock</u>, 868 F.2d 639, 643 (3d Cir. 1989); <u>O'Halloran v. Ryan</u>, 835 F.2d 506, 508 (3d Cir. 1987).

Exhaustion is not a jurisdictional limitation, however, and federal courts may review the merits of a state petitioner's claims prior to exhaustion when no appropriate state remedy exists. Christy v. Horn, 115 F.3d 201, 206 (3d Cir. 1997); Doctor, 96 F.3d at 681; Carter v. Vaughn, 62 F.3d 591, 594 (3d Cir. 1995). A petitioner shall <u>not</u> be deemed to have exhausted state remedies, however, if he has the right to raise his claims by any available state procedure. 28 U.S.C. § 2254(c).

An application for a writ of habeas corpus may be denied on the merits, however, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State. 28 U.S.C. § 2254(b)(2).

2.    Procedural Default Doctrine

Beyond questions of exhaustion, a federal court may be precluded from reviewing claims under the "procedural default doctrine." Gray v. Netherland, 518 U.S. 152 (1996); Coleman v. Thompson, 501 U.S. 722, 732 (1991); Doctor, 96 F.3d at 678; Sistrunk v. Vaughn, 96 F.3d 666, 678 (3d Cir. 1996). Like the exhaustion requirement, the procedural default doctrine was developed to promote our dual judicial system and, in turn, it is based upon the "independent and adequate state law grounds" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment. Coleman v. Thompson, 501 U.S. at 750.

A state's procedural rules are entitled to deference by federal courts; a petitioner's violation of a state procedural rule may constitute an independent and adequate state law ground for denial of federal review of habeas claims under the procedural default doctrine. Id.; Sistrunk, 96 F.3d at

673.  Moreover, violations of a state's procedural rules may constitute an independent and adequate state ground sufficient to invoke the procedural default doctrine even where no state court explicitly has concluded that a petitioner is procedurally barred from raising his claims.  Glass v. Vaughn, 65 F.3d 13, 15 (3d Cir. 1995), *cert. denied*, 516 U.S. 1151 (1996); Carter, 62 F.3d at 595.  However, the procedural default doctrine only applies when a state procedural rule is consistently or regularly applied.  Banks v. Horn, 126 F.3d 206, 211 (3d Cir. 1997) (quoting Johnson v. Mississippi, 486 U.S. 578, 588-89 (1988)).[2]  A petitioner whose constitutional claims have not been addressed on the merits due to procedural default can overcome the default, thereby allowing federal court review, if he or she can demonstrate either:  1) "cause" for the default *and* "actual prejudice" as a result of the alleged violation of federal law; or 2) failure to consider the claims will result in a "fundamental miscarriage of justice."  Coleman, 501 U.S. at 750; Carter, 62 F.3d at 595.

Finally, the United States Court of Appeals for the Third Circuit has instructed that a petition containing exhausted and unexhausted but procedurally barred claims is not a mixed petition requiring dismissal under Rose v. Lundy, 455 U.S. 509 (1982).  *See* Wenger v. Frank, 266 F.3d 218, 227 (3d Cir. 2001).  Instead, the Court of Appeals held that the district court should review the merits of the exhausted claims but must not decide the merits of the claims that are barred under the procedural default doctrine.  *Id*.

In the case at bar, the only issue raised on direct review was the following;

> Did the trial court err in denying Defendant's Post sentence motion to withdraw his guilty plea due to defense counsel's ineffectiveness where trial counsel adopted a strategy to admit the veracity of an out

---

2.  *See also* Doctor, 96 F.3d at 675 (the state rule must be firmly established and regularly followed before it can be considered an independent and adequate state law ground sufficient to foreclose federal court review under the procedural default doctrine).

of court statement by Defendant that was extremely prejudicial and
against Defendant's wishes?

Doc. No. 68, pp. 9-10.

To the extent that the claims raised in the Amended Petition are different than that stated

above, Petitioner has procedurally defaulted these claims by failing to properly present it to the

Pennsylvania courts in accordance with applicable Pennsylvania law. In this respect, in order to

comply with the exhaustion requirement in 28 U.S.C. § 2254, Petitioner was required to present all

of his federal habeas claims to the Pennsylvania courts in his direct appeal or in his PCRA

proceeding. Because he failed to do so, this Court must determine whether Petitioner has any other

available state court remedy through which he can present his unexhausted claims to the

Pennsylvania courts. Under Pennsylvania law, the exclusive remedy to challenge a conviction

following direct appeal is through a PCRA proceeding brought in accordance with the Post

Conviction Relief Act. *See* 42 Pa. Cons. Stat. § 9542. Under the PCRA, a petitioner may bring a

second PCRA petition only as provided for in the PCRA, as set forth below.

> (b)     Time for filing petition.--
>
> > (1) Any petition under this subchapter, including a second or subsequent
> > petition, shall be filed within one year of the date the judgment becomes
> > final, unless the petition alleges and the petitioner proves that:
> >
> > > (I) the failure to raise the claim previously was the
> > > result of interference by government officials with the
> > > presentation of the claim in violation of the
> > > Constitution or laws of this Commonwealth or the
> > > Constitution or laws of the United States;
> > >
> > > (ii) the facts upon which the claim is predicated were
> > > unknown to the petitioner and could not have been
> > > ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented.

(3) For purposes of this subchapter, a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review.

(4) For purposes of this subchapter, "government officials" shall not include defense counsel, whether appointed or retained.

42 Pa. Cons. Stat. § 9545(b).  The Supreme Court of Pennsylvania has held that the PCRA's timeliness requirements are mandatory and jurisdictional in nature; thus, no court may properly disregard or alter them in order to reach the merits of the claims raised in a PCRA petition that is filed in an untimely manner.  *See, e.g.*, Commonwealth v. Murray, 562 Pa. 1, 5, 753 A.2d 201, 202-203 (2000); Commonwealth v. Fahy, 558 Pa. 313, 328-29, 737 A.2d 214, 222 (1999); Commonwealth v. Peterkin, 554 Pa. 547, 722 A.2d 638, 641 (1998).

Under Pennsylvania law, the only potential state remedy that Petitioner may pursue to raise his unexhausted claims is a second PCRA petition.  In order for him to be able to file a second PCRA now, he must allege facts that show that:  1) the failure to raise the claim previously was the result of interference by government officials; 2) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or 3) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply

retroactively. 42 Pa. Cons. Stat. § 9545(b)(1). Petitioner's habeas petition does not allege any of the three exceptions listed above. Consequently, he is precluded from presenting his unexhausted claims in a second PCRA petition based on the time limitations set forth in the PCRA. These time limitations are an independent and adequate state law ground sufficient to invoke the procedural default doctrine for purposes of federal court review. *See* Lines v. Larkin, 208 F.3d 153, 165 (3d Cir. 2000).

As stated previously, this federal court may not review Petitioner's defaulted claims unless he demonstrates cause and prejudice for his default or establishes a fundamental miscarriage of justice. Edwards v. Carpenter, 529 U.S. 446, 451 (2000). To satisfy the cause standard, a petitioner must demonstrate that some objective factor external to the defense impeded his or her efforts to raise the claim in state court. McCleskey v. Zant, 499 U.S. at 493 (1991); Murray v. Carrier, 477 U.S. 478, 488 (1986). To show prejudice, a petitioner must demonstrate that the error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions, not merely that the error created a "possibility of prejudice." Carrier, 477 U.S. at 494.

In order to establish prejudice to excuse a procedural default, a petitioner has to convince the federal court that there is a "reasonable probability," not a mere possibility, that the result of the trial would have been different if the evidence at issue had been disclosed to the jury. Strickler v. Greene, 527 U.S. 263, 289 (1999). " 'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " *Id.* at 289-90 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)). In other words, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Id.* at 290 (internal quotation omitted). It is the defendant's burden to establish a reasonable probability of a different result.

*Id.* at 291 (emphasis deleted). Employing the prejudice test set forth above, it is clear that the Petitioner has failed to establish the prejudice required to overcome his procedural default for failing to raise his claims in timely manner.

Finally, Petitioner also has not demonstrated that a fundamental miscarriage of justice will result from the failure of this Court to review his claims. In Schlup v. Delo, 513 U.S. 298 (1995), the Supreme Court explained the narrow class of cases implicating a fundamental miscarriage of justice. Specifically, the Court defined the miscarriage of justice exception by holding that a habeas petitioner is required to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 327 (quoting Murray v. Carrier, 477 U.S. at 496). The Court instructed that "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." *Id.* at 324. The Court further explained that "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. The petitioner thus is required to make a stronger showing than that needed to establish prejudice." *Id.* at 327.

The federal courts, including the Court of Appeals for the Third Circuit, are in agreement that, in order to show a fundamental miscarriage of justice under the Schlup standard, a petitioner must offer new or reliable evidence in support of his claim of **factual** innocence. *See, e.g.*, Keller v. Larkins, 251 F.3d 408, 415-16 (3d Cir. 2001) ("To show a fundamental miscarriage of justice, a petitioner must demonstrate that he is actually innocent of the crime by presenting new evidence of innocence.") (citations omitted). Actual innocence means "factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). Petitioner has failed to meet his burden in this regard because, based on all of the

evidence, this Court cannot conclude that no rational juror would have voted to convict him of first-degree murder. *See, e.g.*, Sweger v. Chesney, 294 F.3d 506, 524 (3d Cir. 2002) (holding that petitioner failed to submit new evidence to show that he was actually innocent of first-degree murder); Glass v. Vaughn, 65 F.3d 13, 17 (3d Cir. 1995) (same). Consequently, this Court will not review his defaulted claims.

### C. Standard of Review

In describing the role of federal habeas proceedings, the Supreme Court of the United States, in Barefoot v. Estelle, 463 U.S. 880, 887 (1983), noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996, (AEDPA), which further "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

Amended Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations and provides, in relevant part, as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C.§ 2254(d).

"A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir.2004) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Few state court decisions will be "contrary to" Supreme Court precedent. "Clearly established Federal law" should be determined as of the date of the relevant state-court decision. Greene v. Palakovich, Civil No. 07-2163, 2010 WL 2134575 (3d Cir. May 28, 2010).

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent.  "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular … case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'"  Id. (quoting Williams, 529 U.S. at 407).

Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence.  28 U.S.C. § 2254(e).  Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it."  Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000).  In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state

court applied federal law correctly.  *Id*. (citing <u>Marshall v. Lonberger</u>, 459 U.S. 422, 433 (1982)).  Where the state court fails to adjudicate or address the merits of a petitioner's claims, unless procedurally defaulted, the federal habeas court must conduct a *de novo* review over pure legal questions and mixed questions of law and fact.  <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir. 2001).

### D. Petitioner's Claim

Petitioner's claim concerns the adequacy of his guilty plea.  A defendant's plea of guilty amounts to a waiver of his constitutional right to a trial by jury.  The Supreme Court repeatedly has held that, as with any waiver of a constitutional right, the Due Process Clause of the United States Constitution requires that a guilty plea be made "knowingly, voluntarily and intelligently."  <u>Boykin v. Alabama</u>, 395 U.S. 238 (1969).  The constitutional standard is one that asks whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.  *Id*. at 243.

Whether a plea of guilty is voluntary for purposes of the federal constitution is a question of federal law.  <u>Marshall v. Lonberger</u>, 459 U.S. 422, 432 (1983).  To determine whether a guilty plea represents a voluntary and intelligent choice, a reviewing court must examine the totality of the circumstances surrounding the plea.  <u>Brady v. United States</u>, 397 U.S. 742, 749 (1970).  To ensure that a plea is both knowing and voluntary, it cannot have been induced through misrepresentation or coercion, <u>Brady</u>, 397 U.S. at 750, the defendant must have notice of the nature of the charge(s) against him, <u>Henderson v. Morgan</u>, 426 U.S. 637, 645 (1976), the defendant must have an understanding of the law in relation to the specific facts at issue, <u>McCarthy v. United States</u>, 394 U.S. 459, 466 (1969), and the defendant must appreciate the consequences of the plea, *i.e.*, he must understand the rights he is surrendering through his plea.  Once entered, a defendant does not have an absolute right to withdraw a guilty plea.  <u>United States</u>

v. Isaac, 141 F.3d 477 , 485 (3d Cir. 1998). Rather, a plea of guilty entered by one fully aware of the direct consequences must stand unless induced by threats, misrepresentation, or improper promises.

Here, Petitioner alleges that his guilty plea was involuntary by reason of ineffective assistance of counsel. The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (*quoting* Strickland v. Washington, 466 U.S. 668, 684 (1984)). *See also* Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) (the essence of a claim alleging ineffective assistance is whether counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect).

The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: 1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687. The first prong of the Strickland test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 688. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." *Id*. at 689. The question is not whether the defense was free from errors of judgement, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. *Id*.

The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. Strickland, 466 U.S. at 689. To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different. *Id*, 466 U.S. at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome. *Id*. A defendant is not entitled to relief unless he makes both showings. *Id*. at 687. The Strickland standard applies equally to appellate counsel. <u>Smith v Robbins</u>, 528 U.S. 259, 285 (2002).[3]

In <u>Hill v. Lockhart</u>, 474 U.S. 52 (1985), the Supreme Court applied the <u>Strickland</u> two-part test for determining ineffective assistance of counsel in a case where the defendant challenged a guilty plea. Thus, in order to show that he is entitled to relief, Petitioner first must show that the advice he received from counsel was not within the range of competence demanded of attorneys in criminal cases. <u>Siers v. Ryan</u>, 773 F.2d 37, 42 (3d Cir. 1985), *cert. denied*, 490 U.S. 1025 (1989) (citing <u>Tollett v. Henderson</u>, 411 U.S. 258, 266-267 (1973)). In order for Petitioner to satisfy the prejudice requirement, he must demonstrate that there is a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Hill v. Lockhart</u>, 474 U.S. at 58.

In its review of Petitioner's claim, the Superior Court held as follows.

> Our review of the record in this case establishes that prior to accepting the Appellant's guilty plea, the trial court explained the charges against him, the maximum sentence for each crime. The trial court also explained all of the rights the Appellant would be giving up by pleading guilty. In addition, the trial court questioned Appellant regarding his understanding of the written guilty plea colloquy form, the voluntariness of

---

3. In analyzing Petitioner's claims under the two-part test announced in <u>Strickland</u>, this Court must apply the standards set forth in section 2254(e) concerning the presumption of correctness applicable to state court factual findings. The question of effectiveness of counsel under <u>Strickland</u> is a mixed question of law and fact; it requires the application of a legal standard to the historical, fact determinations. <u>Berryman</u>, 100 F.3d at 1095. In this regard, a state court's finding that counsel had a trial strategy is a finding of fact to which the presumption applies. *Id*. Likewise, a state court's determination that a decision was a tactical one is a question of fact. *Id*. A state court's determination of whether such strategy or decision was reasonable is a question of law. *Id*. *See also* <u>McAleese v. Mazurkiewicz</u>, 1 F.3d 159, 166 (3d Cir.) ("[A] state court's <u>conclusion</u> that counsel rendered effective assistance is not a finding of fact subject to deference by a federal court."), *cert. denied*, 510 U.S. 1028 (1993).

his plea, and his guilt as to the crimes charged. The trial court specifically inquired into the nature of the plea agreement which included the condition Appellant stipulate to the truthfulness of the 21-page statement. Appellant understood that by entering into the general plea and admitting to the 21-page statement as true that the death penalty was being taken off the table and that the trial court would determine the degree of guilt. During the plea hearing, Appellant informed the trial court that he was entering the plea because it was in his best interest. He also stated he was satisfied with the representation he received from counsel. Further, when questioned by the Commonwealth, Appellant admitted to writing the 21-page statement. He indicated that no one threatened or forced him to write the document. He also confirmed that the statement was authentic and truthful. Id. In light of Appellant's testimony, defense counsel thereafter stipulated that there was a sufficient factual basis in the criminal information to support the plea. Appellant also understood that defense counsel would so stipulate.

Despite Appellant's statements on the record at the plea hearing, he now contends that his guilty plea was involuntarily entered due to trial counsel's ineffectiveness. Specifically, he claims that trial counsel abandoned the strategy to attack the veracity of the statement when there were weaknesses in the Commonwealth's case. Appellant contends that defense counsel could have impeached the Commonwealth's witness, David Witt, who was a career criminal and who had induced him to write the statement to get a continuance and have counsel appointed. He also maintains that his wife would have attested that he had never beaten her and that he did not own a .45 caliber pistol as the as the 21-page statement had indicated. Additionally, he notes that defense experts had agreed the description of injuries to the child were accurate but that mechanism of the injury in the statement was inaccurate. He also contends defense counsel could have pointed to discrepancies in the forensic reports and the statement regarding whether any of the victim's hair was missing. Instead, Appellant argues that trial counsel decided to embrace the statement as true. Appellant claims that this strategy induced an involuntary plea since he had no choice but to be subject to a life sentence before a judge or the death penalty before a jury.

We find that Appellant's claim lacks merit. Appellant's allegations are belied by the record at the guilty plea hearing. A person who elects to plead guilty is bound by the statements he makes in open court while under oath, and he may not later assert grounds for withdrawing the plea which contradict the statements he made at his plea colloquy. Appellant attested he was satisfied with his counsel's representation and had ample opportunity to review with counsel the written plea colloquy and the terms of the plea agreement. Appellant also confirmed that he had written the statement and

had not been coerced or threatened to do so. He also stipulated that the statement was true. Moreover, it is evident that at the post-sentence hearing, Appellant was not able to specifically point out which portions of the 21-page statement were false.

Moreover, Attorney Aston had a reasonable basis for advising Appellant to enter into the plea agreement which included stipulating to the truth of the 21-page statement. Upon review, it is evident that the 21-page statement, which counsel and Appellant characterized as "horrendous," was going to be admitted at trial before a death-qualified jury. Attorney Aston believed that if the statement was heard by a jury that Appellant would be subject to the death penalty. Attorney Aston knew that Appellant was not going to testify at trial and deny the truth of the 21-page statement. Additionally, the pathologists which had been consulted in this case told Attorney Aston not to call them at trial. They acknowledged that there were consistencies between the medical evidence and the 21-page statement but recognized there were some discrepancies regarding how the injuries were inflicted. Since the details of the statement could have had a profound impact on the jury, we agree with the trial court that Attorney Aston had a reasonable basis for a strategy that took the death penalty off the table.

We are also mindful that Attorney Aston's strategy differed from that of Attorney Antkowiak who would have attacked the veracity of the statement. However, we do not find that the difference in strategy renders Attorney Aston ineffective. Moreover, the trial court did not find credible Appellant's contention that he wrote the 21-page confession because David Witt convinced him that something dramatic needed to be done in order to obtain a continuance. Additionally, the trial court was free to disbelieve Appellant's allegation that he was informed that Attorney Antkowiak had agreed with Attorney Aston's strategy and a refusal to stipulate would result in a death sentence. Accordingly, we find the trial court did not err in denying Appellant's post-sentence motion to withdraw guilty plea.

Doc. No. 68, pp.13-16 (internal citations omitted).

A recent decision of the Supreme Court illustrates the deference that we must accord to the Superior Court's decision. In Renico v. Lett, ___ U.S. ___, 130 S.Ct. 1855 (May 3, 2010), the Supreme Court reviewed the Court of Appeals for the Sixth Circuit's grant of a writ of habeas corpus to a defendant who was retried for murder following the trial judge's grant of a mistrial after the jury had deliberated for at least four hours following a relatively short, and far from complex, trial. The Michigan Supreme Court

had concluded there was no violation of the Double Jeopardy Clause because the trial court exercised its sound discretion. The federal district court granted a writ of habeas corpus and the Sixth Circuit affirmed, both concluding that the trial court's declaration of a mistrial constituted an abuse of discretion because there was no manifest necessity. The Supreme Court reversed.

> It is important at the outset to define the question before us. That question is not whether the trial judge should have declared a mistrial. It is not even whether it was an abuse of discretion for her to have done so-the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of ... clearly established Federal law." § 2254(d)(1).

Lett, 130 S.Ct. at 1862. The Supreme Court further instructed:

> It is not necessary for us to decide whether the Michigan Supreme Court's decision-or, for that matter, the trial judge's declaration of a mistrial-was right or wrong. The latter question, in particular, is a close one. As Lett points out, at a hearing before the Michigan Court of Appeals, the state prosecutor expressed the view that the judge had in fact erred in dismissing the jury and declaring a mistrial. The Michigan Supreme Court declined to accept this confession of error, People v. Lett, 463 Mich. 939, 620 N.W.2d 855 (2000), and in any event-for the reasons we have explained-whether the trial judge was right or wrong is not the pertinent question under AEDPA.

Id. at 1865, n.3

Applying Lett to the case at bar, I find that Petitioner has not shown that the Superior Court's decision was an unreasonable application of clearly established Federal law as determined by the Supreme Court. Petitioner makes much of the fact that his trial counsel should not have advised him to stipulate to the truth of the statement but he points to no evidence to show that it would have been suppressed at trial. Thus, had counsel advised him not to take the plea because of the stipulation to the truthfulness of the 21-page statement, the result would have been a trial. Given the trial court's rulings, it seems likely that the jury would have been charged with determining the statement's "truthfulness" with a plausible outcome

of disbelieving Petitioner's assertion that it was false as did the trial judge.  Thus, Petitioner could well have faced the death penalty had counsel told Petitioner not to take the plea.  Furthermore, Petitioner certainly has not pointed to any evidence to show that he would not have been found guilty of first degree murder even without the introduction of the 21-page statement.

In this regard, it is clear from the testimony of Stephani and her mother that, before Lonny was killed, he had significant bruising on his body indicative of several severe beatings by Petitioner.  Petitioner does not deny that he engaged in this behavior.  He agreed on at least two occasions to seek professional help to learn to control his temper when it came to disciplining Lonny; unfortunately, he never did.  Shortly after Lonny arrived at the hospital, children's services was called as the bruising on his body was a clear indication of child abuse.  The pathologists all agreed that the bruising on Lonny's body was consistent with a pattern of abuse.

In finding Petitioner guilty of first degree murder, the trial court noted the following.

> *** I'm going to find you guilty of first degree murder, and I'm going to tell you why.  Might as well - - first degree murder is wilful, deliberate and premeditated murder.  And as I look at this, I – you started on the course of – there's classic murder; lying in wait like you ambush somebody, that's first degree  murder.  But the kind of first degree murder this reminds me of is like if you poison somebody, like you want to kill somebody, so every day in their cereal or in their oatmeal or in their food you put a little bit of poison.  And that's exactly what you did.  Every time, the abuse escalated, it got worse, you started to get smarter, you started to hit him in the hair so nobody would see it.

> It's clear to me in this case, whether you killed him on the day in question or whether you killed him two days later or four days later, you were set on a course of willful deliberate murder that had only one possible outcome.  Because you weren't going to change.  And that was the death of this child.

Doc. No. 98, pp. 77-78.

The physical and testimonial evidence in this case, even without the 21-page statement, supports the trial court's determination of Petitioner's pattern of abuse such as to support a conviction of first degree murder. There simply is no basis whatsoever to find counsel ineffective for advising his client to accept the plea, along with the stipulation, in order to spare his client the death penalty.

"Judicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 689. Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a defendant must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " <u>Id</u>. Petitioner has not shown that the state court decisions are contrary to clearly established Federal law, as determined by the Supreme Court of the United States or that they involve an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States. In order for Petitioner to succeed on his claims it is not enough to convince a federal court that in its independent judgment the state court applied the law incorrectly, it must have applied the law in an "objectively unreasonable manner." <u>Lett</u>, 130 S.Ct at. Petitioner clearly has not made such a showing. Therefore, he is not entitled to habeas relief. An appropriate order follows.

### E. Certificate of Appealability

Section 2253 generally governs appeals from district court orders regarding habeas petitions. Section 2253(c)(1)(A) provides that an appeal may not be taken from a final order in a habeas proceeding in which the detention arises out of process issued by a State court unless a certificate of appealability has been issued. A certificate of appealability should be issued only when a petitioner has made a substantial

showing of a denial of a constitutional right. 28 U.S.C. § 2254(c)(2). Here, the record fails to show a violation of Petitioner's constitutional rights. Accordingly, a certificate of appealability will be denied.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Dated: June 15, 2010